**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLORADO**

| | |
|---|---|
| MADELINE TORMOEN,<br><br>Plaintiff,<br><br>v.<br><br>BRIDGEPOINT EDUCATION, INC.; and<br>UNIVERSITY OF THE ROCKIES, LLC;<br><br>Defendant. | Case No.: |

**COMPLAINT**

COMES NOW, Plaintiff, MADELINE TORMOEN, by and through her attorney of record, JASON J. BACH, ESQ., of THE BACH LAW FIRM, LLC, and hereby submits this Complaint and alleges against the above-named Defendant, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

**INTRODUCTION**

This is a Complaint for damages brought by a female student of Defendant, University of the Rockies, LLC (hereinafter, referred to as "UOR"), which is wholly owned and operated by Defendant, BRIDGEPOINT EDUCATION, INC. (hereinafter, referred to as "Bridgepoint," and, together with UOR, the "University"). Ms. Tormoen brings claims against the University for failing to fulfill its obligations under Title IX, 20 U.S.C. 20 § 1681, for negligent hiring, training and supervision for the delay in her graduation resulting from the failure to address her complaints of sexual harassment perpetrated against her by a University faculty member, and breach of contract.

///

1

## PARTIES & JURISDICTION

1.      This Court has jurisdiction over the claims set forth in this action pursuant to 28 U.S.C. § 1331 based upon Title IX to the Education Amendments of 1972; 20 U.S.C. § 1681, *et. seq*.

2.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) in that the University engages in substantial business within this forum amounting to sufficient minimum contacts; including, but not limited to, offering its goods and services in Colorado and in this judicial district; the harm caused to Ms. Tormoen by the acts and omissions of the University giving rise to Ms. Tormoen's claims occurred or had effects in this judicial district; and Ms. Tormoen and UOR are located in this district.

3.      Plaintiff, MADELINE TORMOEN, at all relevant times was a citizen of the State of Colorado and was a student at UOR located in Denver, Colorado.

4.      Defendant, BRIDGEPOINT EDUCATION, INC., is a for-profit corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 13500 Evening Creek Drive, Suite 600, San Diego, California. Bridgepoint wholly owns and operates UOR in Denver, Colorado.

5.      Defendant, UNIVERSITY OF THE ROCKIES, LLC, is a limited liability company organized and existing under the laws of the State of Colorado and has its principal place of business at 1201 16th Street, Suite 200, Denver, Colorado.  UOR's mailing address is listed with the Colorado Secretary of State as in care of Cindi Payne, Bridgepoint Education, 13500 Evening Creek Drive, Suite 600, San Diego, California.

6.      At all times relevant hereto, and in all their actions described herein, the University's actions took place in the State of Colorado.

7.      The University did the acts and omissions hereinafter alleged in bad faith and with knowledge that its conduct violated well established and settled law.

## GENERAL FACTUAL ALLEGATIONS

8.      Ms. Tormoen began studying at the University in January 2009 and is pursuing her Doctorate Degree.

9.      On February 9, 2014, Ms. Tormoen submitted her Letter of Intent for her dissertation and on February 20, 2014, received the following feedback: "The study is highly compelling and will address an important problem in the discipline. The student should proceed to the proposal phase; the issues identified should be addressed in the proposal. The LOI should not be resubmitted for review."

10.     Between June 18, 2014-July 3, 2014, Ms. Tormoen exchanged a series of emails with committee member Dr. Stein through which Ms. Tormoen was instructed as to the best suggested methodology to employ to pass the Research Review Board (hereinafter, referred to as the "RRB") hearing.

11.     On October 16, 2014, Ms. Tormoen met with Dr. Lefly, the chairperson of her dissertation committee, about the proposal, and she discussed not using as many quotes in her writing. This is regular feedback that a student receives during the dissertation process, and Ms. Tormoen adjusted her work.

12.     On January 19, 2015, Ms. Tormoen received an email from Dr. Stein who stated her 'Chapter III' looked pretty good, but she did not understand an aspect of her method of study and instructed her to do a mixed method study. This issue was also resolved. On June 25, 2015, Ms. Tormoen submitted her dissertation proposal to the RRB after receiving support to do so by her committee.

13.     On July 14, 2015, the RRB shockingly rejected Ms. Tormoen dissertation proposal. After 16 months, she was required to change her research population, research questions, and methodology. Ms. Tormoen was also told she could not rely heavily on doctoral dissertations despite the fact her reference list included approximately 180 references, most of which were peer-reviewed journal articles.  Her proposal referenced only doctoral dissertations related directly to her study.

14.     On July 19, 2015, Ms. Tormoen e-mailed Dr. Lefly to set up a meeting to discuss the issues she was facing with the RRB. On July 20, 2015, Ms. Tormoen sent another e-mail to Dr. Lefly with an idea to revise the dissertation, looking for any way to salvage the months of work she had put into her dissertation.

15.     On July 30, 2015, Ms. Tormoen was finally able to get a meeting with Dr. Lefly. At that meeting, Ms. Tormoen vocalized her frustrations with the RRB process. Dr. Lefly suggested that Ms. Tormoen work with Dr. Sherman. However, Ms. Tormoen related a prior encounter in which Dr. Sherman had been extremely rude to her. Dr. Lefly responded by saying, "[You] should just flatter him because you are a female and he is a male New York … He's real New Yorker."

16.     Ms. Tormoen was offended to hear the only way she could advance academically at the University was by being sexually suggestive with a professor.

17.     On August 3, 2015, Dr. Lefly denied Ms. Tormoen's proposed revisions to her dissertation.

18.     On August 8, 2015, Ms. Tormoen sent Dean Gilbert the facts surrounding the sexually discriminatory remarks made to her by Dr. Lefly.

///

19.     On August 10, 2015, Ms. Tormoen met with Dean Gilbert regarding the incident. He said he would replace Dr. Lefly as the chairperson and would become actively involved in the process.

20.     On August 12, 2015, Ms. Tormoen spoke in detail over the phone with Parrish Nicholls, J.D., regarding the incident with Dr. Lefly.

21.     On August 13, 2015, Ms. Tormoen filed a Title IX, Sexual Harassment/Misconduct Complaint against Dr. Lefly through Parrish Nicholls via email correspondence.

22.     On September 9, 2015, Ms. Tormoen's Complaint was denied. The University's Title IX officer, Francesca Galarraga stated, "[We] have completed our preliminary investigation. We did not find the comment made by Dr. Lefly to rise to the level of creating a sexually hostile environment or any other form of sexual harassment/misconduct. Therefore, lacking reasonable cause to charge Dr. Lefly with a violation of the policy, our Title IX investigation is concluded." There were no findings of fact included in this correspondence; it was completed as a formality with boilerplate language. No actual investigation ever took place. Otherwise, any rational fact finder would have determined that Dr. Lefly's comments certainly rose to the level of sexual harassment/misconduct.

23.     As this time, Dean Gilbert and Dr. Lefly are no longer employed at the University.

24.     As a result of the University's arbitrary, capricious, and unlawful actions, Ms. Tormoen has been prevented from completing her dissertation due to repeated rejections of her work by the RRB who has acted outside their role and treated Ms. Tormoen in a discriminatory manner, delaying complainant's progress from completing her degree at the University by at least one year, thus halting her ability to complete her program or to enter her chosen profession.

///

## FIRST CAUSE OF ACTION

### VIOLATION OF TITLE IX (*20 U.S.C. §§ 1681–1688*)

25.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 24, inclusive, as if fully set forth herein.

26.     As defined by Title IX, the University is an educational institution which receives federal financial assistance.

27.     The University receives federal funds through federal student aid and federal grants.  As a result, even if it were not obliged to do so under state law, the University was required to adopt and implement sexual harassment policies under Title IX.

28.     The University intentionally created a long-standing systemic, sexually hostile environment of harassment by professors despite repeated actual notice of sexual harassment by engaging in:

> i.     A pattern and conspiracy of deliberate acts without regard to the known risks of condoning sexual harassment by a systemic failure to investigate sexual harassment by faculty members in a manner consistent with University and/or OCR policies, failing to discipline faculty members found to have committed acts of sexual harassment, and failing to disclose results of investigations within 60 days, if at all.

> ii.     A pattern of deliberate acts without regard to the known risks of giving special and favorable treatment to esteemed faculty, which creates a culture where faculty members understand they may

engage in sexual harassment with little to no consequences to their employment at the University or their careers.

iii.    A pattern of deliberate acts, without regard to the known risks, of unreasonably failing to take prompt, adequate, and effective remedial actions and measures to remedy a substantial known risk of sexual harassment by faculty members.

29.    Ms. Tormoen was a University student who was subjected to harassment based upon her gender. This harassment was sufficiently severe and pervasive to create an abusive educational environment and persisted as a result of the deliberate indifference of staff at every level of authority.

i.    Ms. Tormoen suffered extraordinary harm due to the sexually harassing conduct of Dr. Lefly.

ii.    Administrators at the University had actual notice of Dr. Lefly's propensity to sexually harass female students, prior to Dr. Lefly's harassment of Ms. Tormoen.

iii.    The University created a sexually hostile environment by failing to prevent, address, or correct Dr. Lefly's sexual harassment of Ms. Tormoen.

iv.    The University's failure to correct and address known sexual harassment, failing to provide meaningful sanctions, up to and including termination of employment, or prevent retaliation against Ms. Tormoen, was clearly unreasonable in light of known circumstances.

v.     The University's response to the sexual harassment was sufficiently

severe, pervasive, and objectively offensive, and so undermined and

detracted from Ms. Tormoen's educational experience that she was

effectively denied equal access to educational resources, benefits,

and opportunities.

30.     The University violated the requirements of Title IX by the following acts and

omissions, all of which were conducted, and/or failed to be conducted, in reckless and deliberate

indifference to the risk of harm posed to Ms. Tormoen:

i.     Failing to adopt and publish an appropriate grievance procedure for

the prompt and equitable resolution of sexual harassment and sex

discrimination complaints in violation of Title IX;

ii.     Failing to comply with their own explicit policy banning sexual

harassment upon students;

iii.     Taking steps known, or which should have been known, to be

ineffectual in eliminating Dr. Lefly's sexual harassment of female

students;

iv.     Failing to take immediate and appropriate corrective actions to

remedy the known harassment by Dr. Lefly following the

complaints of Ms. Tormoen;

v.     Failing to notify Ms. Tormoen of her right to contact local law

enforcement;

vi.     Failing to disclose mental health services available to victims of

sexual harassment to Ms. Tormoen;

8

vii.      Failing to protect Ms. Tormoen from Dr. Lefly's retaliatory conduct after she made her complaint of Dr. Lefly's sexual harassment;

viii.     Failing to provide basic details to Ms. Tormoen in the Equal Opportunity investigation memo;

ix.      Failing to provide Ms. Tormoen with a written notice of the outcome of her complaint;

x.      Failing to officially conduct and conclude an investigation into Ms. Tormoen's complaint;

xi.      Maintaining strict confidentiality to the benefit of Dr. Lefly, despite overwhelming evidence that Dr. Lefly sexually harassed Ms. Tormoen;

xii.      Failing to assure Ms. Tormoen that the University will take steps to prevent the recurrence of any harassment and to correct its discriminatory effects on Ms. Tormoen and other victims;

xiii.     Failing to adopt a "zero tolerance" policy for sexual harassment; and

xiv.     Failing to give adequate training to staff members in Title IX requirements to protect against sexual harassment

31.      The University's conduct rises to the level of deliberate indifference, which encompasses the University's negligence.

32.      The University knew or, in the exercise of reasonable care, should have known that Dr. Lefly was not fit for a position in which she would be working with female students.

33.      The University failed to train Dr. Lefly properly to perform her duties as Dean of Research.

34.     The University knew or, in the exercise of reasonable care, should have known the full extent of Dr. Lefly's sexual harassment of female students, yet retained Dr. Lefly and failed to provide adequate supervision.

35.     The University violated Ms. Tormoen's rights as a resident of the United States under 20 U.S.C. §§ 1681-1686.

36.     Ms. Tormoen was a student subject to harassment, which was based upon sex. This harassment was sufficiently severe and pervasive to create an abusive educational environment.

37.     A cognizable basis for liability against the University exists as this educational institution receives federal funds, had actual notice of Dr. Lefly's harassment of Ms. Tormoen, and was deliberately indifferent to this harassment, both before and after the harassment occurred.

38.     Specifically, the University was deliberately indifferent to Dr. Lefly's sexual harassment of Ms. Tormoen by receiving actual notice of prior harassment, but failing to prevent the harassment of Ms. Tormoen; failing to prevent Dr. Lefly from retaliating against Ms. Tormoen; and addressing Ms. Tormoen's reports of sexual harassment in a manner clearly unreasonable in light of known circumstances.

39.     Such deliberate indifference by the University placed Ms. Tormoen, as well as other similarly situated, vulnerable students, at risk of sexual harassment by Dr. Lefly.

40.     As a direct and proximate cause of the University's violations of Title IX, Ms. Tormoen suffered and continues to suffer humiliation, severe emotional distress, loss of professional reputation, and permanent psychological damages resulting from this incident.

41.     As a further direct and proximate cause of the University's violations of Title IX, Ms. Tormoen has incurred expenses and will likely incur future expenses for medical and psychological treatment resulting from this incident.

42.     As a further direct and proximate result of the University's violations of Title IX, it has been necessary for Ms. Tormoen to retain the services of counsel to prosecute this action, and she is entitled to an award of reasonable attorney's fees and costs.

## SECOND CAUSE OF ACTION

### NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION

43.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 42, inclusive, as if fully set forth herein.

44.     The University owed a duty of care to protect Ms. Tormoen from sexual harassment, which was unwarranted, unwanted, and improper.

45.     The University breached its duty of care in its hiring, training, supervision, and retention of Dr. Lefly, an employee that the University knew or, in the exercise of reasonable care, should have known, was unfit to work with female students.

46.     As a direct and proximate cause of the University's negligent hiring, training, supervision and retention of Dr. Lefly, Ms. Tormoen was sexually harassed.

47.     As a further direct and proximate cause of the University's negligent hiring, training, supervision and retention of Dr. Lefly, Ms. Tormoen suffered and continues to suffer humiliation, severe emotional distress, loss of professional reputation, and permanent psychological damages resulting from this incident.

48.     As a further direct and proximate cause of the University's negligent hiring, training, supervision and retention of Dr. Lefly, Ms. Tormoen has incurred expenses and will likely incur future expenses for medical and psychological treatment resulting from this incident.

49.     As a further direct and proximate result of the University's negligent hiring, training, supervision and retention of Dr. Lefly, it has been necessary for Ms. Tormoen to retain

the services of counsel to prosecute this action, and she is entitled to an award of reasonable attorney's fees and costs.

## THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

50.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 49, inclusive, as if fully set forth herein.

51.    Courts in Colorado and the Tenth Circuit impose a contract on the relationship between students and universities. Materials actually provided to students, including enrollment agreements and catalogs, may become part of the agreement.

52.    Ms. Tormoen has an express and implied contract with the University in connection with rights explicitly guaranteed by the 2014-2015 Dissertation Handbook (hereinafter, referred to as the "Dissertation Handbook") and Institutional Review Board Handbook (hereinafter, referred to as the "IRB Handbook").

53.    The Dissertation Handbook states, in pertinent part:

> The purpose of the RRB is to ensure academic rigor, quality, and appropriateness of a proposed research study, evaluating particularly the alignment of the research problem and questions with the research methodology and design. The RRB will review the dissertation at various stages of its development to provide approval and feedback on research methodology issues. The RRB does not act as a subject matter expert on the content of the dissertation itself, which is the responsibility of the dissertation chair and committee members.

54.    The University breached its contract with Ms. Tormoen by allowing the RRB unbridled power beyond the Dissertation Handbook guidelines. The University's RRB imposed irrational and judgmental criticism and mandates upon Ms. Tormoen. Further, the RRB did not give her an opportunity to meaningfully discuss the critiques that were the cause for the RRB's

rejection.   This caused Ms. Tormoen extreme delay in reaching successive transition points to complete her degree, as the board mandated that she change her dissertation methodology, population, and focus based on these irrational and judgmental criticisms. Ms. Tormoen contacted RRB panelists to obtain feedback on several occasions; RRB panelists failed to address Ms. Tormoen's concerns. Moreover, Ms. Tormoen's Chairperson told Ms. Tormoen, on a recording, that RRB did not understand Ms. Tormoen's research, as Ms. Tormoen's work was too advanced for them and subsequently encouraged Ms. Tormoen to keep her work simple so that it would be understood in this academic setting. Additionally, the RRB failed to promote Ms. Tormoen's case based on International Review Board (hereinafter, referred to as the "IRB") concerns, which is not part of the RRB's evaluation criterion, and based their complaints on concerns about Ms. Tormoen's personal history, which has nothing to do with the standards of academic rigor, quality, or appropriateness.

55.     The IRB Handbook specifies, "Research that poses only minimal risk to adult human participants and does not pertain to sensitive or personal aspects of the participants' behavior or involve concealment or deception may be granted an Expedited review." Full review is demanded when "[s]urveys or questionnaires solicit information regarding personal or sensitive aspects of the participants' behavior, including sexual practices, instances of child or sexual abuse suffered by the participant, criminal activities, drug and alcohol use, or eating disorders."

56.     The University breached its contract with Ms. Tormoen when it refused to grant her expedited review request on April 12, 2016, as Ms. Tormoen's research subjects do not fall into any of the protected categories a full IRB review panel requires. The University's breach is particularly egregious, given that Ms. Tormoen already modified her proposed study to account for IRB decisions per RRB requests following her meetings last fall, and described in paragraph

54 above, and also accounted for IRB concerns during the two expedited request revisions she completed following IRB's instructions between February and April 12, 2016.

57.     The Dissertation Handbook specifies the following requirements for passing Transition Point IV: institutional review board student applications "requests to be submitted by the 15th of each month for most efficient consideration" and "the IRB approval process may take one to five weeks; plan accordingly." The IRB Handbook specifies that an expedited review takes 12-18 days and a full review takes 15-25 days.

58.     The University breached its contract with Ms. Tormoen by scheduling IRB meeting on May 24, 2016, a full 28 business days after Ms. Tormoen received notice that her proposal warranted a full review. The University's breach is particularly egregious given that Ms. Tormoen took time off from work to amend her request to comply with IRB full review mandates following the 6-week gap caused by the University's untimely denial of her first completed request and multiple-requested revisions, only to have her review extend past the IRB Handbook and Dissertation Handbook guaranteed timeframe because "they couldn't fit her in" the regularly scheduled May 3, 2016, hearing date.

59.     As a result of the University's multiple breaches, Ms. Tormoen has endured an unreasonable delay in progressing towards completion of her degree. The University's numerous breaches involving extended deadlines and timeframes have cost Ms. Tormoen eleven months to date, far longer than scheduled or expected, forcing Ms. Tormoen to continue to remit tuition and delay her career aspirations, while awaiting the University's improper, capricious, and illegal delays.

///

///

60.     As a direct and proximate cause of the University's numerous breaches of its contract, Ms. Tormoen suffered and continues to suffer humiliation, severe emotional distress, loss of professional reputation, and permanent psychological damage.

61.     As a further direct and proximate cause of the University's numerous breaches of its contract, Ms. Tormoen has incurred expenses and will likely incur future expenses for medical and psychological treatment resulting from these incidents.

62.     As a further direct and proximate result of the University's numerous breaches of its contract, it has been necessary for Ms. Tormoen to retain the services of counsel to prosecute this action, and she is entitled to an award of reasonable attorney's fees and costs.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

63.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 62, inclusive, as if fully set forth herein.

64.     Courts in Colorado and the Tenth Circuit have adopted the Restatement (Second) of Torts definition of intentional infliction of emotional distress:  one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.

65.     The University intentionally inflicted emotional distress upon Ms. Tormoen causing her to suffer through the series of events she endured throughout her dissertation process, as described herein. The University used its inappropriate and unbridled power to repeatedly launch irrational and judgmental criticisms and thrust unfair standards on the progression of Ms. Tormoen's dissertation.

///

66.     Such unfair and illegal standards included instructing Ms. Tormoen to use her gender to influence RRB members to accept her work, requiring constant revisions that later were rejected despite Ms. Tormoen's stringent adherence to the instructions, and giving false advice to Ms. Tormoen for meeting the requirements for her dissertation. These egregious acts of mistreatment are so wholly outside the scope of permitted conduct as to rise to the level of outrageousness.

67.     The actions of University were outrageous and intentional and done with malice while recklessly disregarding the likelihood of causing Ms. Tormoen to suffer severe emotional distress.

68.     As a proximate result of the illegal, arbitrary and capricious acts of Defendant, Ms. Tormoen has suffered academically, emotionally, and professionally. Additionally, as a proximate result of the mentioned acts of defendant, Ms. Tormoen has been unable to pass critical steps for completing her degree, resulting in additional tuition expenses dollars and an inability to work in the field.

69.     In doing the acts alleged, Defendant acted knowingly, intentionally, and maliciously, in that phone calls, emails and in-person meetings directed Ms. Tormoen to meet arbitrary, illegal, and capricious expectations and use improper methods to gain board approval.

70.     As a direct and proximate cause of the University's intentional infliction of emotional distress, Ms. Tormoen suffered and continues to suffer humiliation, severe emotional distress, loss of professional reputation, and permanent psychological damage.

71.     As a further direct and proximate cause of the University's intentional infliction of emotional distress, Ms. Tormoen has incurred expenses and will likely incur future expenses for medical and psychological treatment resulting from these incidents.

16

72.     As a further direct and proximate result of the University's intentional infliction of emotional distress, it has been necessary for Ms. Tormoen to retain the services of counsel to prosecute this action, and she is entitled to an award of reasonable attorney's fees and costs.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Ms. Tormoen demands a jury trial for all issues in this matter.

*WHEREFORE*, Ms. Tormoen prays that this Honorable Court enter judgment in Ms. Tormoen's favor, and against the University: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial; (b) for injunctive and declaratory relief; (c) for interest; (d) together with the costs and disbursements of this action and such other attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000d, *et. seq.*; and (e) further relief as justice requires.

DATED this 27th day of May, 2016.

**THE BACH LAW FIRM, LLC**

By    */s/ Jason J. Bach*
        JASON J. BACH, ESQ.
        7881 W. Charleston Blvd., Suite 165
        Las Vegas, Nevada 89117
        Telephone:  (702) 925-8787
        Facsimile:  (702) 925-8788
        *Attorney for Plaintiff Madeline Tormoen*